## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| TAMEKA BRYANT, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | Case No.:_____ |
| vs. | ) | |
| | ) | |
| WAL-MART STORES EAST, LP, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| DEFENDANT. | ) | |
| | ) | |
| | ) | |

## COMPLAINT

COMES NOW Plaintiff Tameka Bryant (hereinafter "Plaintiff" or "Ms. Bryant"), by and through her undersigned counsel, and files her Complaint as follows:

## PARTIES, JURISDICTION, AND VENUE

### 1.

Ms. Bryant is a resident of Fayette County, Georgia, and is authorized to bring this action.

### 2.

Wal-Mart Stores East, LP, (hereinafter "Walmart" or "Defendant"), is a Delaware Limited Partnership with a principal office address of 702 SW 8th St., Bentonville, AR, 72716.  Walmart conducts business in Fulton County, Georgia and

may be served with process via its registered agent, the Corporation Company, at 106 Colony Park Drive Ste. 800-B, Cumming, GA, 30040-2794.

3.

Plaintiff's claims arise under the federal Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101, *et seq*.; therefore, jurisdiction with this Court is proper pursuant to 28 U.S.C. § 1331.

4.

Walmart resides in and conducts business in this judicial district and division, and a substantial part of the events or omissions giving rise to the claim occurred in Fulton County, Georgia; therefore, venue with this Court is proper pursuant to 28 U.S.C. § 1391 and 28 U.S.C. § 90(a)(2).

## ADMINISTRATIVE EXHAUSTION

5.

On September 22, 2022, Ms. Bryant timely filed charges of disability discrimination and retaliation with the U.S. Equal Employment Opportunity Commission ("EEOC") against Walmart (the "Charge"). (*See* Exhibit A, Ms. Bryant's Charge.)

6.

On September 27, 2023, the EEOC issued Ms. Bryant a Notice of Right to Sue; therefore, this Complaint was timely filed within 90 days of Ms. Bryant's receipt of her Notice of Right to Sue.  (*See* Exhibit B, Notice of Right to Sue.)

7.

Plaintiff has fully complied with all prerequisites to jurisdiction in this Court under Title VII.

## **FACTUAL ALLEGATIONS**

### **Ms. Bryant's Employment with Walmart**

8.

Walmart hired Ms. Bryant in or around June 2017 to work as a Consolidation Associate at its e-commerce distribution center located in Union City, Georgia (hereinafter, the "Facility").

9.

As a Consolidation Associate, Ms. Bryant was responsible for intaking, indexing, and tracking online orders shipped to the Facility and preparing such orders for delivery to consumers.

10.

Ms. Bryant consistently received positive performance reviews in her role as a Consolidation Associate.  As a result, Ms. Bryant was eventually promoted to the position of Trainer.

11.

In her role as a Trainer, Ms. Bryant assisted in onboarding, and providing on-the-job training for, newly hired Associates in the Facility, particularly those working within the Consolidation department.

**Ms. Bryant's Disabilities and Reasonable Accommodations**

12.

During her employment with Walmart, Ms. Bryant suffered from multiple temporary and permanent disabilities.

13.

In or around 2017, Ms. Bryant notified Walmart that she suffered from diabetes and generalized anxiety disorder, conditions that substantially limited and/or impaired one or more of her major life activities.

14.

In light of her disabilities, Ms. Bryant requested from Walmart reasonable accommodations to assist her in performing the duties of her position(s).

15.

After working with Walmart's third-party claims management service, Ms. Bryant received approval for multiple reasonable accommodations which would allow her to perform the basic functions of her role as a Trainer, in light of the constraints imposed by her disabilities.

16.

The accommodations afforded to Ms. Bryant allowed her to, for example, take extended lunch breaks, carry a cell phone on the floor of the Facility, maintain emergency food in the Facility, and leave the Facility during her shift in the event of an emergency.

17.

Additionally, in or around 2019, Ms. Bryant requested, and was approved for, multiple temporary accommodations due to pregnancy-related disabilities.

18.

For example, Walmart authorized Ms. Bryant to, *inter alia*, take multiple work breaks and carry lip balm on her person during work.

19.

Moreover, Walmart authorized Ms. Bryant's placement on temporary alternate duty ("TAD") during the course of her pregnancy, which allowed her light

duty that provided relief from certain physical activities associated with her Consolidation Associate position.

20.

Accordingly, Ms. Bryant temporarily served the function of a Systems Associate during her pregnancy-related TAD.  In this TAD position, Ms. Bryant reported to the Systems department, and supported the Consolidation department by, *inter alia*, assisting with device programming and/or maintenance, and equipment exchanges.

21.

The reasonable accommodations Walmart afforded to Ms. Bryant quickly engendered noticeable resentment from her managers and/or supervisors.

22.

Ms. Bryant's supervisors frequently expressed frustration that Ms. Bryant was entitled to such "luxuries" that other Facility employees were not.

23.

These supervisors frequently complained amongst themselves, to Ms. Bryant, and to other employees in the Facility, regarding the perceived strain Ms. Bryant's accommodations placed on their ability to manage and supervise Ms. Bryant's employment.

24.

Ms. Bryant's managers found particularly troubling Ms. Bryant's entitlement to carry a cell phone and take intermittent breaks as needed.

25.

In addition to her supervisors' general distaste for Ms. Bryant's disability-related accommodations, these supervisors repeatedly subjected her to adverse employment actions on the heels of her requests for reasonable accommodations.

**Ms. Bryant's Suspension**

26.

In or around July 2021, a Walmart representative notified Ms. Bryant that she was being placed on an unpaid suspension from her employment with Walmart due to a complaint submitted by a Facility supervisor in July 2021.

27.

The complaint made against her by a supervisor alleged, without further detail, that Ms. Bryant "was off task 8 hours out of 15 hours scheduled and prevented multiple associates from working for this same duration."

28.

At Ms. Bryant's urging, Walmart investigated the supervisor's internal complaint and determined that these supposed justifications forming the basis for her suspension were unfounded.

29.

As a result of these findings, the supervisor who lodged the complaint was terminated from her employment with Walmart, but, Ms. Bryant was not asked to return from her suspension.

30.

Instead, a Human Resources representative contacted Ms. Bryant in November 2021—while Ms. Bryant continued to serve her wrongful suspension— to offer a severance package in exchange for her agreement to leave Walmart.

31.

Through this "severance package," the Company offered Ms. Bryant a modest payment in exchange for her agreement to resign her employment, waive her right to re-apply for employment with Walmart, and release any and all claims she had against Walmart.

32.

Ms. Bryant declined Walmart's offer of severance; however, the Company did not allow Ms. Bryant to return to work when she communicated her denial of the severance offer.

33.

Rather, citing some alleged discrepancy between the accommodations she requested upon her return and those accommodations recommended by her medical provider, Walmart left Ms. Bryant on an indefinite suspension.

34.

Ms. Bryant's indefinite suspension continued until February 2022, when Walmart eventually determined that the accommodations she sought were indeed reasonable and necessary.

**Walmart Forces Ms. Bryant to Re-Apply for Her Position Upon Return**

35.

The issues surrounding Ms. Bryant and her medical accommodations continued upon her return to work in February 2022.[1]

36.

Shortly after returning, the Company informed Ms. Bryant that she must re-apply for her position as a Trainer. Despite communicating that the re-application process was administrative in nature, Walmart representatives instructed Ms. Bryant that she should submit an application for the position she already occupied, then

---

[1] While this Complaint sets forth certain factual allegations that have been raised in earlier EEOC charges filed by Ms. Bryant against Walmart, these factual allegations serve merely as background for the events giving rise to Ms. Bryant's claims in this action, which pertain only to events in and after February 2022.

meet with a Human Resources representative and a member of her supervisory team regarding the position.

37.

In her meeting with Human Resources and her supervisory staff, her primary supervisor, Omar Crawley, explained to the Human Resources representative present during the meeting that he did not wish to re-hire Ms. Bryant for the same position as a Trainer on his team.

38.

Mr. Crawley stated that he did not wish to re-hire Ms. Bryant because of the burdens that her accommodations posed on him and his team.

39.

The Human Resources representative present during this meeting frantically instructed Mr. Crawley that this was not a legitimate reason to deny Ms. Bryant consideration for the Trainer position.

40.

Even so, Ms. Bryant, seeing further evidence of the continued animus held by her management team regarding her disabilities and accommodations, elected to forego—at least temporarily—her position as a Trainer, file an internal ethics complaint against Mr. Crawley, and resume her position as a Consolidation Associate.

**Walmart's Internal Job Fair and Refusal to Hire Ms. Bryant for a New Position**

41.

Just two (2) months after Ms. Bryant's re-application meeting, in which Omar Crawley communicated he did not want Ms. Bryant to work on his team due to the accommodations she received, the Company held an internal job fair allowing Facility employees to apply for promotions and lateral opportunities in different departments.

42.

In light of the animus Ms. Bryant's supervisors in the Consolidation department held and communicated toward her, Ms. Bryant submitted an application for a position as a Systems Associate, in which position Ms. Bryant would be supervised and/or managed by an entirely distinct staff.

43.

Ms. Bryant was well qualified for the Systems Associate position because she had served the same functions required of the position during her time on TAD, and had received positive feedback from the Systems department to whom she reported during that period.

44.

After submitting her application, Company representatives contacted Ms. Bryant, requesting an initial interview for the Systems Associate position; however,

instead of interviewing with the supervisory and managerial team for the Systems department, the Company required her to submit to an interview with a Human Resources representative and the Facility's General Manager.

45.

Following her interview, Ms. Bryant received feedback from the Human Resources team that she had received strong marks during the interview.

46.

A few days after her interview, Ms. Bryant learned that Walmart had refused to further consider her application and denied her the opportunity to interview with the Systems Department's leadership team.

47.

Additionally, a Human Resources representative informed Ms. Bryant, after her interview, that Ms. Bryant's application had been placed in the "do not hire" file.

48.

Walmart selected a non-disabled candidate for the position who was less qualified or equally qualified for the position.

**Ms. Bryant's Termination**

49.

The next month, on or around June 8, 2022, Ms. Bryant's then-supervisor, Daisy Espinoza, called a meeting with Ms. Bryant and informed her that Ms. Bryant would be issued another suspension.

50.

Despite Ms. Bryant's repeated requests for an explanation, Ms. Espinoza furnished no justification for the suspension and refused Ms. Bryant's request to provide a written statement, instead telling Ms. Bryant only that someone from the Company's Human Resources department would be in touch with her at an undisclosed time to provide more information.

51.

Ms. Bryant was then escorted out of the Facility by Human Resources representatives.

52.

After being escorted from the Facility, Ms. Bryant heard nothing from any Company personnel until more than one week later, when she received a call from Human Resources personnel on or around June 16, 2022.

53.

During the call, Ms. Bryant was informed that she had been terminated from her employment with Walmart because she had engaged in "workplace violence" by

purportedly engaging in an altercation with another Associate working on the floor on June 7, 2022—an incident that did not occur.

54.

Despite claims by the Company's Human Resources representatives that they had investigated the matter, the Company did not interview Ms. Bryant, did not allow Ms. Bryant to leave a written statement, and refused Ms. Bryant's request to view any relevant video footage from the countless security cameras located inside the Facility or body cameras carried by the Facility's security personnel.

55.

Moreover, although Walmart routinely had private security and/or police officers stationed at the Facility, and customarily engaged the same to address alleged incidents of actual or threatened workplace violence, Walmart did not engage the officers regarding the alleged disturbance that Walmart cited as the reason for Ms. Bryant's termination.

56.

While Walmart terminated Ms. Bryant's employment, the other employee—who is not disabled—with whom Ms. Bryant allegedly had a physical altercation remained employed with the Company following the alleged incident.

57.

Upon information and belief, the true reason for Ms. Bryant's termination was that Defendant, through its agents and employees, no longer wished to provide Ms. Bryant with the accommodations for which she had been approved.

58.

As a result of her termination, Ms. Bryant became unemployed and lost job opportunities.

59.

Ms. Bryant was also subjected to stress, anxiety, and humiliation because of her termination and her forced departure from the Facility in June 2022.

## COUNT I

### DISABILITY DISCRIMINATION
### Termination in Violation of the ADA

60.

Ms. Bryant realleges and incorporates as if set forth fully the foregoing paragraphs.

61.

At all times relevant hereto, Defendant has been an employer with 15 or more employees, and is therefore subject to the requirements of Title I of the ADA.

- 15 -

62.

At all times relevant hereto, Ms. Bryant was an individual with a disability as defined by the ADA, 42 U.S.C. § 12102(1)(A).

63.

Defendant was aware of Ms. Bryant's disabilities and history and record of disabilities.

64.

At all times relevant hereto, Ms. Bryant has been a qualified individual with a disability as that term is defined by 42 U.S.C. § 12111(8) and able to perform the essential functions of her jobs as a Consolidation Associate and Trainer, with or without accommodations, as demonstrated by her.

65.

Defendant discriminated against Ms. Bryant when it terminated her based on its unwillingness to continue providing her with her pre-approved, reasonable accommodations.

66.

Walmart's alleged reason(s) for terminating Ms. Bryant's employment is/are pretext for unlawful discrimination.

67.

Walmart did not terminate similarly situated, non-disabled employees who engaged in the same alleged misconduct of which Walmart accused Ms. Bryant.

68.

The intent and effect of Defendant's unlawful conduct has been to limit, classify, and discriminate against individuals who request and/or receive reasonable accommodations under the ADA; and Ms. Bryant, who is a victim of such practices, was unlawfully deprived of income in the form of wages, prospective money benefits, and various other benefits solely because of her disability in sums to be proven at trial.

69.

As a result of Walmart's discriminatory conduct, Ms. Bryant has suffered damages, including but not limited to back pay and front pay, the loss of future benefits, emotional distress, and the costs of bringing this action.

70.

Walmart intentionally violated Ms. Bryant's rights under the ADA with malice or reckless indifference and, as a result, is liable for punitive damages.

## COUNT II

### DISABILITY DISCRIMINATION
### Failure to Hire in Violation of the ADA

71.

Ms. Bryant realleges and incorporates as if set forth fully the foregoing paragraphs.

72.

At all times relevant hereto, Defendant has been an employer with 15 or more employees, and is therefore subject to the requirements of Title I of the ADA.

73.

At all times relevant hereto, Ms. Bryant was an individual with a disability as defined by the ADA, 42 U.S.C. § 12102(1)(A).

74.

Defendant was aware of Ms. Bryant's disabilities and history and record of disabilities.

75.

At all times relevant hereto, Ms. Bryant has been a qualified individual with a disability, as that term is defined by 42 U.S.C. § 12111(8), and able to perform the essential functions of her positions as a Consolidation Associate and Trainer, and the Systems Associate position for which she applied, with or without accommodations.

76.

Ms. Bryant sought to be hired for the position of Systems Associate, and was qualified for the Systems Associate position because she performed the same functions of that position during her pregnancy-related TAD.

77.

Walmart did not hire Ms. Bryant for the Systems Associate position, which would have served as a promotion and allowed Ms. Bryant more favorable working conditions away from the supervisors and/or managers who held and expressed animus toward Ms. Bryant because of her disabilities and corresponding accommodations.  Instead, Walmart selected a non-disabled candidate for the position who was less qualified or equally qualified for the position.

78.

Walmart's unwillingness to continue providing Ms. Bryant with accommodations was the reason an equally or lesser qualified non-disabled candidate was selected for Systems Associate position.

79.

As a result of Walmart's discriminatory conduct, Ms. Bryant has suffered damages, including but not limited to back pay and front pay, the loss of future benefits, emotional distress, and the costs of bringing this action.

80.

Walmart intentionally violated Ms. Bryant's rights under the ADA with malice or reckless indifference and, as a result, is liable for punitive damages.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Tameka Bryant demands a trial by jury and respectfully prays for judgment and relief as follows:

(a)   Back pay, front pay, and lost benefits;

(b)   Compensatory damages to the extent allowed by law;

(c)   Punitive damages;

(d)   Attorneys' fees and costs of litigation;

(e)   Pre-judgment and post-judgment interest at the highest lawful rate; and

(f)   Such other and further relief as this Court deems just and proper.


Respectfully submitted this 22nd day of December, 2023.

*s/Daniel F. Barrett*
Justin B. Connell
Georgia Bar No.: 231772
Daniel F. Barrett
Georgia Bar No. 475652

ELARBEE, THOMPSON, SAPP & WILSON, LLP
800 International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303
(404) 659-6700
(404) 222-9718 (Facsimile)
connell@elarbeethompson.com
barrett@elarbeethompson.com

*Counsel for Plaintiff Tameka Bryant*